NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

INTERGROUP CORP., et al.,                     :
                                              :
          Plaintiffs,                         :
                                              :          Civil Action No. 04 cv 4591 (JAG)
          v.                                  :
                                              :                    **OPINION**
EQUINOX BUSINESS CREDIT CORP.,                :
et al.,                                       :
                                              :
          Defendants.                         :
                                              :

---

**GREENAWAY, JR., U.S.D.J.**

This matter comes before the Court on the application of Intergroup Corporation

("Intergroup") and John Winfield ("Winfield"), its CEO (collectively, "plainttiffs"), for the

appointment of a receiver, or in the alternative, issuance of a preliminary injunction limiting the

operations of EquiFin, Inc. ("EquiFin") and its subsidiary, Equinox Business Credit Corporation

("Equinox").

The dispute stems from plaintiffs' investment in EquiFin.  On September 22, 2003,

plaintiffs purchased $1,000,000 worth of convertible notes from EquiFin. The note purchase

agreement provided that plaintiffs' unsecured debt would be *pari passu*[1] to any future

indebtedness incurred by EquiFin.  Plaintiffs claim that an investment by Laurus Master

Funding, Ltd. ("Laurus") in December 2003 violated the terms of plaintiffs' agreement with

---

[1] *Pari passu* is defined as being "[b]y an equal progress; equably; ratably; without preference.
Used especially of creditors who, in marshalling assets, are entitled to receive out of the same
fund without any precedence over each other."  BLACK'S LAW DICTIONARY 1115 (6th ed. 1990).

EquiFin by giving Laurus's debt seniority over plaintiffs' debt.  In addition, plaintiffs claim that defendants made material misrepresentations[2] during the negotiations leading up to plaintiffs' investment, and that since the time of their investment, defendants have mismanaged EquiFin's and Equinox's business to such an extent that the companies are now almost worthless.

Based on these concerns, plaintiffs simultaneously filed in this Court a complaint and a request for an order to show cause seeking appointment of a receiver, or, in the alternative, for an order limiting the operations of EquiFin and Equinox.

Specifically, in their complaint and request for an order to show cause, plaintiffs allege:

(1) violations of §10(b) of the Exchange Act and Rule 10b-5 by EquiFin and Walter "Chip" Craig, Jr. ("Craig") (fraud claim);

(2) violations of §20(a) of the Exchange Act by Craig, Allen H. Vogel ("Vogel"), and Daniel T. Murphy ("Murphy") (control person claim);

(3) violations of N.J. STAT. ANN. § 49:3-47[3] by Craig and EquiFin (state law fraud claim);

(4) violations of N.J. STAT. ANN. § 49:3-71(d) (state control person claim);

---

[2]  Plaintiffs allege that defendants made two material misrepresentations: (1) that the funds plaintiffs invested would be used to increase Equinox's asset-based loan portfolio; and (2) that the notes issued to plaintiffs would be *pari passu* to any future indebtedness incurred by EquiFin.

[3]  Although plaintiffs cite N.J. STAT. ANN. § 49:3-47 as the basis for their state law securities fraud claim, it appears that N.J. STAT. ANN. § 49:3-52 actually establishes the prohibition on making "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstance under which they are made, not misleading." Further,  N.J. STAT. ANN. § 49:3-71(c) creates a civil cause of action against persons who, in connection with the sale or purchase of a security, make "any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading."  Therefore, this Court will address the state law fraud claim under N.J. STAT. ANN. § 49:3-52.

2

(5) breach of contract by EquiFin;

(6) common law fraud on the part of EquiFin and Craig;

(7) negligent misrepresentations by EquiFin and Craig;

(8) breach of covenant of good faith and fair dealing by all defendants;

(9) breach of fiduciary duty and duty of loyalty by the individual defendants;

(10) violation of N.J. STAT. ANN. § 2C:41-1 by all defendants (civil RICO claim);

(11) civil conspiracy by all defendants; and

(12) request for injunctive relief including,

    (a) an accounting from January 1, 2003 to the present,

    (b) providing plaintiffs with access to the books and records of EquiFin and any other entities affiliated with or owned or controlled by EquiFin;

    (c) restraining, enjoining and/or preventing EquiFin, Equinox or any other entities affiliated with and/or owned or controlled by EquiFin from acting to impact EquiFin's financial situation or expending any funds other than those pre-approved by the court as necessary to carry on business, and

    (d) terminating Craig's, Vogel's and Murphy's employment with, and officerships and/or directorships in, EquiFin and its subsidiaries (injunctive relief claim).

Plaintiffs base their claims on allegations that the defendants knowingly misrepresented their plans to use proceeds from privately placed debt to grow EquiFin's loan portfolio, as well as a misrepresentation that EquiFin would maintain sufficient cash reserves to protect Winfield's

and Intergroup's unsecured investment.[4]  In addition, the convertible notes that Winfield and Intergroup purchased included a provision that they would not be subordinate to other debt incurred by EquiFin, which provision plaintiffs claim was violated when EquiFin issued a convertible note to Laurus in December 2003.

Defendants oppose the appointment of a receiver, as well as the issuance of an injunction, claiming that Equinox and EquiFin had been managed in a responsible manner, that none of the terms of the note purchase agreement have been breached or defaulted upon, and that all relevant and necessary information was disclosed accurately and completely to defendants.

**Facts**

**Parties**

EquiFin is a publicly traded commercial finance company that provides loans to small and mid-size businesses.  (Craig Aff. at ¶ 2; Compl. at ¶ 18.)

Equinox is an 81% owned subsidiary of EquiFin.  Equinox provides asset based loans of $500,000 to $3,000,000 to small and mid-sized businesses.  (Craig Aff. at ¶ 3; Compl. at ¶ 20.)

Walter "Chip" Craig, Jr. ("Craig") is President, CEO and Chairman of the Board of EquiFin.  (Compl. at ¶ 7.)  Allen H. Vogel ("Vogel") is a director of EquiFin.  He has served as President of Equinox since December 2001.  (Compl. at ¶ 8.)  Daniel T. Murphy ("Murphy") has served as Executive Vice President of Operations, Chief Financial Officer and a director of

---

[4]  During oral argument, plaintiffs' counsel stated that, for purposes of the current application, he would rely only on the documents and not on any oral representations made in connection with plaintiffs' provision of capital to the defendants.  (Tr. at 5-8 to 6-1.  "Tr." refers to the transcript of the oral argument held before this Court on October 7, 2004.)  Therefore, no arguments were offered with respect to the oral representations regarding EquiFin's cash reserves.  As a result, this Court did not consider these representations as part of the alleged fraudulent misrepresentations.

EquiFin since July 1999.  (Compl. at ¶ 9.)  Thomas A. Werblin ("Werblin") has been a director of EquiFin since April 2003.  (Compl. at ¶ 10.)  John E. Steiglitz ("Steiglitz") is a director of EquiFin.  (Compl. at ¶ 11.)  Lee A. Albanese ("Albanese") has been a director of EquiFin since October 2001.  (Compl. at ¶ 12.)

Intergroup "buys, develops, operates, rehabilitates and disposes of real property of various types and descriptions."  (Compl. at ¶ 3.)  However, "their financial statements indicate that a substantial part (and in some respects the primary part) of their business is building a portfolio of security investments."  (Craig Aff. at ¶ 28.)

John V. Winfield ("Winfield") is the CEO and Chairman of the Board of Intergroup.

Merriman, Curhan, Ford & Co. ("MCF") is a registered broker dealer and a member of the National Association of Securities Dealers ("NASD").  (Craig Aff. at ¶ 33.)  Winfield is the largest investor in MCF.  (Craig Aff. at ¶ 32.)

Laurus Master Funding, Ltd. ("Laurus") provided capital to EquiFin in December 2003, allegedly causing EquiFin to violate its note purchase agreement with plaintiffs.

**Events**

During the spring of 2001, EquiFin converted from a manufacturing company to a diversified finance company.  (Compl. at ¶ 15.)  In connection with that conversion, changes were made to EquiFin's board of directors and management team.  (Craig Aff. at ¶ 4.)

In December 2001, Equinox entered into a Loan and Security Agreement with Wells Fargo Foothill ("the Foothill Agreement").  This agreement provided for a $20,000,000 revolving credit facility.  All assets and capital stock of Equinox were pledged to secure this credit facility.  (Compl. at ¶ 17.)

EquiFin experienced business problems during 2002.  Late in 2002, the American Stock

Exchange ("AmEx") notified EquiFin that the company had failed to meet the continued listing requirements for trading of its common stock. (Craig Aff. at ¶ 13.) EquiFin continued to seek additional funding. During the first quarter of 2003, InterGroup learned of EquiFin's proposed private placement of debt. (Compl. at ¶ 25.) Following up on this information, Winfield called Craig in early July 2003 expressing interest in providing capital for EquiFin. (Craig Aff. at ¶ 30.)

This telephone call began negotiations between Winfield and Craig regarding an investment in EquiFin. On July 29, 2003, Winfield introduced Craig to John Merriman ("Merriman"), a principal at MCF. (Craig Aff. at ¶ 32.) Shortly after this meeting, Merriman telephoned Craig and informed him that Winfield's investment in EquiFin would be pursued through Merriman and MCF. (Craig Aff. at ¶ 35.) Craig executed and delivered an engagement letter to MCF on August 14, 2003. (Craig Aff. at ¶ 36.)

Initially, Craig indicated that EquiFin was seeking an investment of $5,000,000, but, on August 19, 2003, Winfield telephoned Craig to inform him that he and InterGroup were not interested in that large of an investment. (Craig Aff. at ¶ 37.) On August 22, 2003, Craig e-mailed MCF regarding EquiFin's need for $2,000,000 of capital. (Craig Aff. at ¶ 39.) Over the next few weeks, Craig spoke with representatives of MCF, and forwarded information to MCF on behalf of Winfield. (Craig Aff. at ¶ 43.) Craig forwarded an information summary (Craig Aff. Ex. K), EquinFin's annual report, dated December 31, 2002 (Craig Aff. Ex. L), EquiFin's quarterly reports for March 31 and June 30, 2003 (Craig Aff. Exs. M and N), projection of the proposed $2,000,000 investment in EquiFin prepared by Craig (Craig Aff. Ex. O), and a press release announcing termination of merger discussions with Celtic Capital Corp. (Craig Aff. Ex. I.)

On September 22, 2003, Winfield and Intergroup each invested $500,000 and purchased EquiFin's 11% convertible notes with warrants attached.  (Compl. at ¶ 32.)  On September 23, 2003, EquiFin issued its notes and common stock purchase warrants pursuant to the Notes Purchase documents for an aggregate of $1,127,500, of which $1,000,000 was attributable to notes issued to Winfield and Intergroup.  (Craig Aff. at ¶ 44.)  The notes have a maturity date of August 31, 2008.  (Id.)  EquiFin filed an SEC Form 8-K report regarding the consummation of the private placement of $1,100,000 principal amount of 11% convertible subordinated notes due August 31, 2008 and "2,5558,138 [sic] common stock purchase warrants."  (Compl. at ¶ 49 (quoting SEC Form 8-K dated Sept. 23, 2003).)  The SEC Form 8-K stated that the proceeds of the private placement "will be used for portfolio expansion and other working capital purposes." (Compl. at ¶ 50.)

On December 12, 2003, EquiFin filed an SEC Form 8-K that indicated EquiFin and Equinox had executed a Secured Purchase Agreement with Laurus.  (Compl. at ¶ 58.)  Equinox issued a $1,100,000 principal amount subordinated note due December 12, 2006, and EquiFin issued common stock purchase warrants in the amount of 532,257 shares.  The note is secured by all of the personal property in Equinox and is subordinate to the Foothill credit facility.  EquiFin also entered into a revolving loan agreement to borrow up to $3,000,000 including the existing $1,100,000.  (SEC Form 8-K , item 5, attached as Ex. I to Compl.)  There have been no other draws on this revolving credit facility.  (Craig Aff. at ¶ 48.)

Among other concerns, plaintiffs believe that the execution of the agreement with Laurus violated the *pari passu* term of their agreement with defendants.  In an effort to preserve and protect their investment, plaintiffs seek the appointment of a receiver, or, in the alternative, an order limiting the operations of EquiFin and Equinox.

**Appointment of a receiver**

In the present case, plaintiffs seek the appointment of a receiver "to preserve EquiFin's remaining assets, marshal all of EquiFin's assets, recover any improper transfers, and to pay creditors." (Compl. at ¶¶ 113.B, 117.B, 124.B, 128.B, 133.B, 138.B, 143.B, 147.B, 151.B, 160.B, 164.B.)  In essence, plaintiffs allege that defendants fraudulently induced them to invest in EquiFin, and, since the time of plaintiffs' investment, defendants have mismanaged the companies, resulting in the wasting of the company's assets.  Plaintiffs point to the decrease in EquiFin's loan portfolio and the increase in the company's debt as indications of mismanagement and waste.  (Br. in Supp. of Pls.' Order to Show Cause at 3-4.)

While the Third Circuit has recognized that "[a] receiver may be appointed to avert further loss of assets through waste and mismanagement," Tanzer v. Huffines, 408 F.2d 42, 43 (3d Cir. 1969), "it has been judicially noted almost innumerable times that the appointment of a receiver is an extraordinary, a drastic . . . remedy . . . not to be resorted to if milder measures will give the plaintiff, whether creditor or shareholder, adequate protection for his rights."  Maxwell v. Enterprise Wall Paper Mfg. Co., 131 F.2d 400, 403 (3d Cir. 1942).  In Tanzer, the court supported its appointment of a receiver based on its consideration of the following factors:  the same defendants committed "gross and deliberate fraud," the company's non-compliance with requirements of the federal securities laws, omissions in submissions to the court, and misleading information in the company's annual report.  Tanzer, 408 F.2d at 43.

Legal commentators have similarly observed that the appointment of a receiver is granted only in extraordinary circumstances. "Inasmuch as a receivership may interfere seriously with defendant's property rights by ousting him or her from control, and sometimes even possession, the party seeking it must show that he or she has some legally recognized right in that property

8

that amounts to more than a mere claim against defendant.  Thus, a receiver ordinarily will not be appointed at the insistence of a simple contract creditor, even if he demonstrates the inadequacy of his remedy at law, because he has 'no substantive right, legal or equitable, in or to the property of his debtor.'" 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (citing Ivey v. Housing Foundation of America, 73 F. Supp. 201, 204 (M.D.Pa. 1947)).

Here, plaintiffs claim that defendants violated a term of their note purchase agreement, misrepresented the purpose of the financing agreement, and subsequently mismanaged the company.  The underlying relief they seek is monetary in nature – recovery of their investment. Essentially, plaintiffs are "simple contract creditors" who are seeking enforcement of, and relief under, their agreement with defendants.  They only seek to recover their investment, which is a simple monetary claim.  (Br. in Support of Pls.' Order to Show Cause at 9.)

Further, plaintiffs point to no convincing evidence to support their claim that either Equinox or EquiFin were "hemorrhaging" or "burning" cash (Tr. at 33-2 to 33-6), nor do they demonstrate that either company is being run differently than it was at the time of their original investment.  (Tr. at 39-13 to 39-25.)  In fact, during oral argument, in response to this Court's question of "what have they done, other than sign the Laurus agreement, since December of 2003 which shows . . . that they have done the extraordinary things that would require the appointment of a receiver by this Court," plaintiffs' counsel only pointed to the approximately 5% increase in losses between the first six months of 2003 and the first six months of 2004 to support their allegation that the company was being mismanaged.  (Tr. at 35-25 to 37-23.) Plaintiffs failed to provide any concrete explanation for the increase in losses, other than the broad and bald assertion that defendants were mismanaging the company and making poor

business decisions.  For example, they argue that the invested funds should have been used to expand the company's loan portfolio, rather than being used to pay down the company's debt, which is how defendants used the funds.  (Tr. at 34-23 to 35-22.)

This Court concludes that a 5% increase in net losses from one year to the next, combined with a decision to pay down the company's debt, are not extraordinary circumstances and do not evidence the gross mismanagement required to justify the appointment of a receiver. That is, a slight increase in net losses does not equate to a judicial determination of fraud, nor does it parallel disregard for federal securities laws.  Similarly, the fact that defendants made a business decision with which plaintiffs disagree does not justify appointing a receiver. Therefore, the Court cannot identify any basis for appointing a receiver, and plaintiffs' request will be denied.

Plaintiffs have cited to several cases where a court found sufficient justification for appointing a receiver.  However, all of these cases present far more egregious circumstances than those before this Court.

For example, in In Re: National Credit Management Group, 21 F. Supp. 2d 424 (D.N.J. 1998) the defendant was the subject of both federal and state investigations into violations of the Federal Trade Commission Act, the Credit Repair Organization Act, and the New Jersey Consumer Fraud Act.  The violations involved deceptive and fraudulent practices surrounding the marketing of National Credit Management's credit reporting and repair services.  The court, fearing that the defendant would continue to violate these statutes, dissipate the company's assets during the investigation, and potentially destroy evidence integral to the investigation, appointed a receiver to maintain the status quo of the company, particularly in light of the "*aforementioned deceptive practices of the Defendants and the* threat of the dissipation of

10

assets."  Id. at 463 (emphasis in original).

Similarly, the facts underlying the court's appointment of a receiver in Lyman v. Spain, 774 F.2d 495 (D.C. Cir. 1985) presented a far more extreme situation than the one currently before this Court.  In fact, the court described Lyman v. Spain as "an archetypal example of how greed paired with sloth can subvert the legal system."  Id.  In Lyman, several family members involved in a family partnership squandered the income from the partnership over the course of approximately 15-20 years.  As a result, one family member, who had been declared incompetent by the court, did not receive her fair share of the income.  By contrast, the present case involves events that occurred over the course of a few months, between sophisticated businessmen dealing in an arm's length transaction.  Moreover, there is no evidence of squandering of company assets or the expenditure of company assets to the detriment of plaintiffs and the sole benefit of defendant.  In the absence of such proof, appointment of a receiver is improper.

**Preliminary injunction**

In the absence of the appointment of a receiver, plaintiffs seek the imposition of a preliminary injunction.

"[T]he grant of injunctive relief is an 'extraordinary remedy which should be granted only in limited circumstances.'"  Instant Air Freight Co. v. C. F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989) (citing Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988)).  Generally, in determining whether to grant a preliminary injunction or a temporary restraining order, courts in this Circuit review four factors:

(1) the likelihood that the applicant will prevail on the merits at the final hearing; (2) the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; (3) the extent to which the defendants will

11

suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

S & R Corp. v. Jiffy Lube Int'l. Inc., 968 F.2d 371, 374 (3d Cir. 1992) (citing Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 197-98 (3d Cir. 1990)).  "While the burden rests upon the moving party to make [the first] two requisite showings, the district court" should look to factors three and four when relevant.  Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994).  "All four factors should favor relief before an injunction will issue." S & R Corp., 968 F.2d at 374 (citing Hoxworth, 903 F.2d at 192).

In order to prove irreparable harm, the moving party "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" Acierno, 40 F.3d at 653 (quoting Instant Air Freight, 882 F.2d at 801).  "Economic loss does not constitute irreparable harm." Acierno, 40 F.3d at 653. "[T]he injury created by a failure to issue the requested injunction must 'be of a peculiar nature, so that compensation in money cannot atone for it.'" Acierno, 40 F.3d at 653 (citations omitted).  The word "irreparable connotes 'that which cannot be repaired, retrieved, put down again, atoned for.'" Id. (citations omitted).  In addition, the claimed injury cannot merely be possible, speculative or remote. "[M]ore than a risk of irreparable harm must be demonstrated.  The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury.'"  Acierno, 40 F.3d at 655 (citations omitted).

Here, plaintiffs seek a preliminary injunction limiting the operations of Equinox and EquiFin to only those activities approved by this Court and necessary to carry out the business of the two companies.  To succeed on this request, plaintiffs will need to show it is likely that they

12

will prevail on the claims set forth in their complaint, and that they will be irreparably harmed if the defendants are allowed to continue operating their businesses without the supervision of this Court. Additionally, this Court will need to balance those two factors against the potential harm to the defendants if a preliminary injunction is granted and the impact, if any, on the public interest.

**Likelihood of success on the merits**

This Court concludes that plaintiffs have not met their burden of proof regarding the likelihood of success on the merits. Plaintiffs have not set forth sufficient facts to support their claim that defendants violated § 10(b) of the Exchange Act and Rule 10b-5. Although in their complaint plaintiffs alleged numerous causes of action, during oral argument before this Court, plaintiffs focused their attention on the alleged federal securities violations. Specifically, plaintiffs claimed that defendants made two material misrepresentations which serve as the basis for the securities fraud claims: (1) that the funds plaintiffs invested would be used to increase Equinox's asset-based loan portfolio and (2) that the notes issued to plaintiffs would be *pari passu* to any future indebtedness incurred by EquiFin. The arguments necessary to support many of the remaining allegations, such as fraud, breach of contract and negligent misrepresentation, are subsumed by the arguments made in support of the § 10(b) and Rule 10b-5 claims. Therefore, this Court's analysis will focus on the federal securities allegations, which have their basis in a claim of fraud.

**Rule 9(b)**

In pleading fraud, FED. R. CIV. P. 9(b) establishes a heightened pleading standard by requiring that "the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." "Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997) (citations omitted). Rule 9(b) "requires plaintiffs to plead 'the who, what, when, where, and how: the first paragraph of any newspaper story.'" In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. E&Y, 901 F.2d 624, 627 (7th Cir. 1990)). "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (quoting In re Nice Systems, 135 F. Supp. 2d 551, 577 (D.N.J. 2001)). "[I]n applying Rule 9(b), courts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud.'" Id. (quoting Burlington, 114 F.3d at 1418). "Where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed." Id.

**§ 10(b) of the Securities Exchange Act of 1934**

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), prohibits the use of fraudulent schemes or devices in connection with the purchase or sale of securities. Under § 10(b), it is unlawful "[t]o use or employ, in connection with the purchase or sale of any

14

security . . . , any manipulative or deceptive device or contrivance in contravention" of any rule

promulgated by the SEC designed to protect the investing public. To implement the statute, the

SEC enacted Rule 10b-5, violation of which gives rise to a private cause of action. Ernst & Ernst

v. Hochfelder, 425 U.S. 185 (1976); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723

(1975).  That rule, in turn, deems it unlawful

>   (a) [t]o employ any device, scheme, or artifice to defraud,

>   (b) [t]o make any untrue statement of a material fact or to omit to state a material
>   fact necessary in order to make the statements made, in the light of the
>   circumstances under which they were made, not misleading, or

>   (c) [t]o engage in any act, practice, or course of business which operates or would
>   operate as a fraud or deceit upon any person in connection with the purchase or
>   sale of any security.

17 C.F.R. § 240.l0b-5. The Supreme Court has held that standing to bring a private cause of

action under Rule l0b-5 is limited to actual purchasers or sellers of securities.  Blue Chip

Stamps, 421 U.S. at 749.

      To state a violation of Rule 10b-5, plaintiffs must allege "(1) that the defendant made a

misrepresentation or omission of (2) a material (3) fact; (4) that the defendant acted with

knowledge or recklessness and (5) that the plaintiff reasonably relied on the misrepresentation or

omission and (6) consequently suffered damage."  In re Westinghouse Sec. Litig., 90 F.3d 696,

710 (3d Cir. 1996).  Rule 9(b) imposes heightened pleading requirements on plaintiffs in Rule

10b-5 actions.  "In order to state a viable claim pursuant to Rule 10b-5, 'Rule 9(b) requires a

plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge

by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was

made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his

damage.'" Rockefeller Center Properties, 311 F.3d at 216 (internal citations omitted).

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4, further refines this standard by requiring that a complaint which asserts a §10(b) claim "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1).  Further, if "proof that the defendant acted with a particular state of mind" is a required element of the claim, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Plaintiffs who allege securities fraud must "allege specific facts that give rise to a 'strong inference' that the defendant possessed the requisite intent." Burlington, 114 F.3d at 1418. Plaintiffs may establish this strong inference of scienter "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Burlington, 114 F.3d at 1418 (quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995)).  Recklessness, in turn, involves "'not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" In re Advanta Corp., 180 F.3d at 535 (quoting McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979)). "[S]cienter may be alleged by stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior." In re Advanta Corp.,180 F.3d at 535.  However, the PSLRA provides a safe harbor for forward-looking statements made by natural persons.  15

16

U.S.C. §78u-5.  That is, forward-looking statements are "shielded by the safe-harbor provision unless the plaintiff proves it was  made with 'actual knowledge . . . that the statement was false or misleading.'"  In re Advanta Corp., 180 F.3d at 535 (quoting §78u-5(c)(1)(B)(i)).[5]

 The instant case does not present the typical securities case scenario.  Plaintiffs' claims are not based on public misrepresentations or omissions that affected the price of publicly traded securities.  The focus of the claims here are on personal representations made directly by executives of Equinox and EquiFin to plaintiffs.  In this respect, the facts here mirror those presented to the Third Circuit in EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865 (3d Cir. 2000).  The caveat issued in that case is equally applicable here; namely, that private securities actions can be "more akin to a contract action than a securities action."  Id. at 871.  While

---

[5] The safe-harbor provision states that:

> Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that--

(A) the forward-looking statement is--
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement--
> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
> (ii) if made by a business entity; was--
>> (I) made by or with the approval of an executive officer of that entity; and
>> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. §78u-5(c)(1).

determining whether "alleged misrepresentations are immaterial as a matter of law can be readily considered under the precedent, it is far more difficult to do so with the subsequent issues, such as whether [plaintiff] pled scienter with sufficient particularity, failed to plead reasonable reliance and failed to plead loss causation." Id. at 871-72.

**Materiality**

In determining the viability of the 10(b) claim, materiality is the first step in the analysis. Burlington, 114 F.3d at 1417 ("[t]he first step for a Rule 10b-5 plaintiff is to establish that defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading."). To be material, there must be a "'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available.'" In re Advanta Corp., 180 F.3d at 538 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). "Material representations must be contrasted with statements or subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism, which 'constitute no more than 'puffery' and are understood by reasonable investors as such.'" EP Medsystems, 235 F.3d at 872 (citing In re Advanta Corp., 180 F.3d at 538 (quoting Burlington, 114 F.3d at 1428 n.14)).

Plaintiffs allege that defendants made two material misrepresentations. First, they allege that defendants represented that the funds plaintiffs were to invest would be used to increase Equinox's asset-based loan portfolio (Tr. at 6-15 to 6-16), and second, that the notes issued to Winfield and Intergroup would be *pari passu* to any future indebtedness incurred by EquiFin. (Tr. at 17-17 to 17-25.) During oral argument, plaintiffs' counsel emphasized his desire to rely only the documents, rather than any of the oral representations that may have been made. (Tr. at

18

5-21 to 5-23.)  Consequently, none of the argument addressed any oral statements, such as the claim in the complaint that Craig told Winfield that EquiFin would maintain sufficient cash reserves to protect plaintiffs' unsecured investment.  (Compl. at ¶ 28.)

As mentioned previously, during oral argument, plaintiffs' counsel explicitly abandoned this allegation for purposes of the preliminary injunction.  (Tr. at 5-8 to 6-1.)  Considering only the documentary evidence, this Court concludes that the alleged misrepresentations, as evidenced in the documents associated with the transaction, are in fact neither misrepresentations, nor material.

*Portfolio increase*

Plaintiffs' first argument centers on the allegation that plaintiffs' invested funds would be used to expand the company's loan portfolio.  However, other information beyond defendants' alleged assertion regarding the expansion of the loan portfolio was available to plaintiffs.  This information, discussed below, was sufficient to overcome any possibility that the single piece of information regarding the expansion of the loan portfolio so altered the "total mix" of information available to plaintiffs as to make the proposed expansion of the loan portfolio material as a matter of law.  Further, viewing the statement regarding expansion of the loan portfolio in the context of all of the information available to plaintiffs, this Court cannot conclude that the statement was indeed a misrepresentation.  Additionally, the other information available provided sufficient notice for a reasonable investor to be acutely aware of the precarious nature of the EquiFin's financial status and continuing viability.

For example, the Assumptions to Pro Forma Projections (Craig Aff. Ex. O; Craig Aff. Ex. K) (hereinafter "Assumptions") should have alerted a reasonable investor to the fact that an investment in EquiFin would not be used in its entirety to expand the company's loan portfolio.

19

Specifically, the Assumptions were based on the need for an investment of $2 million.  (Id.)  The description of how the proceeds would be used clearly states that $150,000 of the $2 million would be paid out as a 7.5% fee, while an additional $500,000 would be used to repay the Foothill credit facility.  (Id.)

Based on this clear statement as to the intended use for at least part of the investment, plaintiffs' argument that substantially all of the proceeds of the loan would be used to expand the loan portfolio has no support in the record.  Defendants provided unequivocal notice to any potential investor of their intent to use $500,000 to pay down the company's debt with Foothill. However, this $500,000 was intended to be part of a $2 million investment.  As a result, EquiFin's statement that it "will use substantially all the proceeds of this financing to provide junior capital for expansion of its portfolio of asset-based loans" (EquiFin, Inc. Information Summary at 2 (attached as Ex. K to Craig Aff.)),[6] was correct based upon the assumptions provided.  As a result, substantially all of the $2 million investment (or 75%) would be available to expand EquiFin's loan portfolio.

Further, a reasonable investor should have known that an investment of $1 million, which was only half of the investment sought, could not be expected to produce the same results as an investment of $2 million.  Indeed, the initial discussions between Winfield and Craig involved a request for an investment of $5 million in order to effectuate a strategic acquisition that EquiFin was considering.  (Craig Aff. ¶ 37.)  In the absence of a $5 million investment, EquiFin announced its inability to consummate the proposed acquisition.  (Craig Aff. ¶ 40.)  EquiFin

---

[6]  The Information Summary could possibly be viewed as a forward-looking statement, protected under the safe-harbor provisions of 15 U.S.C. § 78u-5.  However, since this Court concludes that the statements made in connection with the potential use of the invested funds were neither misrepresentations nor  material, consideration of the impact of the safe-harbor provisions is not necessary at this time.

continued to seek funding at the $2 million level. (Craig Aff. Ex. K.) Although EquiFin's focus shifted after being unable to complete the acquisition, it was clear that the company was actively seeking financing. The vast discrepancy between the original amount sought and the actual amount invested should have alerted a reasonable investor not only to the need for financing, but also to the likelihood that $1 million was insufficient to meet the company's needs.

Other resources indicated that EquiFin was experiencing financial difficulties and therefore might require funding for purposes other than loan portfolio expansion. For example, EquiFin's independent auditors included a "going concern" qualification in the December 2002 audit report accompanying the year-end financial statements. (Craig Aff. ¶ 12.) Also, plaintiffs admitted that they were well aware of the losses EquiFin had experienced in the quarters leading up to their investment in the company. (Tr. at 37-10 to 37-12.)

All of these facts should have combined to alert a reasonable investor to the potential risk involved with investing in EquiFin, as well as the fact that an investment in the company could be used for purposes other than expansion of the loan portfolio.[7]

*Pari Passu*

Plaintiffs' second argument in support of their allegation of securities fraud focuses on their claim that the agreement between Laurus and EquiFin and Equinox violates the *pari passu* provision of their note purchase agreement with EquiFin.[8] During oral argument, plaintiffs also

---

[7] Plaintiffs' claim of breach of fiduciary duty and duty of loyalty is based on defendants' alleged mismanagement of funds and associated deterioration of EquiFin's assets. However, as just discussed, it does not appear that defendants mismanaged the funds invested, nor even used them for any purposes other than those stated in their Assumptions.

[8] Paragraph 2.1 of the note issued by EquiFin to the plaintiffs provides in pertinent part "that all future indebtedness for money borrowed or evidenced by a note or similar instrument which by its terms is convertible or exchangeable into shares of Common Stock or other equity securities of the Company, and amendments, renewals, extensions, modifications and refundings thereof,

alleged that the Laurus agreement in effect diluted their stock purchase rights.  It appears that plaintiffs viewed the alleged dilution of their stock purchase rights as the equivalent of a violation of the *pari passu* provision.  The two provisions are not the same, nor are they interchangeable.  Paragraph 6.3 of the note issued by EquiFin to the plaintiffs provides for an adjustment in the conversion price of the stock warrants issued to plaintiffs, thus effectively addressing any concerns about dilution of the value of the stock warrants.  (Compl. Ex. G ¶ 6.3.)

As to the *pari passu* requirement, *pari passu* is defined as being "[b]y an equal progress; equably; ratably; without preference.  Used especially of creditors who, in marshalling assets, are entitled to receive out of the same fund without any precedence over each other."  BLACK'S LAW DICTIONARY 1115 (6th ed. 1990).  That is, according to the terms of ¶ 2.1, plaintiffs should be treated equally to any future creditors of EquiFin.  Since plaintiffs are unsecured creditors of EquiFin, any future creditors of EquiFin should be similarly unsecured under the terms of the agreement. Undoubtedly, this provision would be viewed as material by a reasonable investor since the existence, or non-existence, of this provision would "significantly alter[] the 'total mix' of information available."  In re Advanta Corp., 180 F.3d at 538.

While material, ¶ 2.1 is not a misrepresentation, nor have the terms of ¶ 2.1 been violated.  Although Laurus is a secured creditor, Equinox, not EquiFin,[9] provides the security for Laurus's loan.  (Form 8K at 2, attached as Ex. I to Compl. ("The Note is secured by a security interest in all of the personal property of Equinox, which security interest is subordinate to the

_____

will rank pari passu with the Notes, unless the instruments creating such future indebtedness provide by their terms that such indebtedness is junior in right of payment to the Notes." (Compl. Ex. G ¶ 2.1.)

[9]  EquiFin is a party to the agreement with Laurus, but provides no security for the loan.

22

security interest that Equinox has granted to Foothill.").)  Although plaintiffs argued that EquiFin and Equinox are alter egos of each other (Tr. at 9-17 to 9-18), this Court finds little support for this belief.

In the Third Circuit, the alter ego theory is applied only in cases seeking to pierce the corporate veil and hold a parent company liable for acts of its subsidiary, or vice versa. "[I]n order to succeed on an alter ego theory of liability, plaintiffs must essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity and should be treated as such." Pearson v. Component Technology Corp., 247 F.3d 471, 485 (3d Cir. 2001). The Third Circuit alter ego test "requires that the court look to the following factors: gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of [the] debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." Id. at 484-85.

Here, plaintiffs are not asking this Court to hold a parent liable for its subsidiary's actions, but rather to hold that an agreement with the subsidiary is in fact an agreement with the parent.  Also, this Court does not have sufficient information before it to be able to address any of the specific factors set forth by the Third Circuit.  While, during oral argument, plaintiffs contended that, despite the fact that their agreement was with EquiFin, the real purpose behind the agreement was to "funnel[] cash to Equinox because most of EquiFin's, if not all of EquiFin's, operations were conducted through Equinox" (Tr. at 9-17 to 9-18), they provided no support for this bald assertion.  This statement, standing alone, will not satisfy the alter ego test.

Lacking the ability to consider the detailed factors, this Court will look at the general

premise that to establish an alter ego "plaintiffs must essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity and should be treated as such." Pearson, 247 F.3d at 485. Considering this general concept, the Court first notes that Equinox is not a wholly-owned subsidiary of EquiFin. Also, EquiFin has at least one other subsidiary, EquiFin Factors. (Tr. at 19-13 to 19-14.) Although neither party presented any details about the operations of EquiFin Factors, the subsidiary's existence, combined with the fact that Equinox is not a wholly-owned subsidiary, prompts this Court to conclude that EquiFin and Equinox cannot be said to have functioned as a single entity. Therefore, as to EquiFin, plaintiffs and Laurus are, in fact, *pari passu* creditors, and the terms of ¶ 2.1 have not been violated.[10]

**Scienter, reliance and loss causation**

Since the Court concludes that plaintiffs' first basis for their securities fraud claim is neither a misrepresentation nor  material, and their second basis, while material, is not a misrepresentation, the Court need not reach the other criteria of scienter, reliance and loss causation. That is, the pleading requirements for setting forth a violation of § 10(b)[11] are

---

[10]  Plaintiffs' breach of contract, common law fraud and negligent misrepresentation claims are all based on the allegation that the *pari passu* provision of their agreement with EquiFin was breached. Since this Court finds, for purposes of the preliminary injunction analysis, that this provision was not breached, these claims must fail. Plaintiffs' claim of breach of the covenant of good faith and fair dealing is based on an alleged failure to disclose defendant's "concurrent obligations with Laurus." (Compl. ¶ 147.) However, plaintiffs introduced no evidence indicating that EquiFin entered into the Laurus agreement at the same time it entered into the agreement with Winfield and InterGroup. Rather, plaintiffs' evidence shows that the EquiFin/Laurus agreement was consummated on December 12, 2003, (Form 8K at 2, attached as Ex. I to Compl.), while the agreement between plaintiffs and EquiFin was signed on September 22, 2003. (Compl. ¶ 32.) Therefore, there is no basis for this claim.

[11]  "In order to state a viable claim pursuant to Rule 10b-5, 'Rule 9(b) requires a plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the

conjunctive, and without the first factor – materiality – the entire claim fails.  As a result, this Court concludes that plaintiffs cannot prevail on their preliminary injunction application because they cannot show a likelihood of success on the merits.

**Control person liability**

Count two of the complaint alleges a violation of §20(a) of the Exchange Act (15 U.S.C. §78t(a)) as to Craig, Vogel and Murphy.  Section 20(a) provides that

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. §78t(a).

In order to state a claim under this section, "[p]laintiffs must plead facts showing: (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions. . . . 'To establish that a defendant is a control person, a plaintiff must demonstrate [that] 'the defendant had actual power or influence over the allegedly controlled''company." Jones v. Intelli-Check, Inc., Civ. Action No. 01-CV4860 (FLW), 2003 WL 21783693, at *28 (D.N.J. July 30, 2003) (internal citations omitted) (quoting In re: MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998)).  "[I]t is well-settled that controlling person liability is premised on an independent violation of the federal securities laws." Rockefeller Center Properties, 311 F.3d at 211.

As previously discussed, plaintiffs have failed to plead an underlying violation of the securities law by EquiFin or Equinox.  That is, plaintiffs failed to satisfy the first factor in

intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.'" Rockefeller Center Properties, 311 F.3d at 216 (internal citations omitted) (emphasis added).

pleading a violation of § 10(b), namely, materiality.  "The lack of any predicate violation of the

Securities Exchange Act of 1934 compels dismissal of control person claims."  <u>California Pub.</u>

<u>Employees' Retirement Sys. v. Chubb Corp.</u>, No. 03-3755, 2004 WL 3015578, at n.21 (3d Cir.

Dec. 30, 2004).  As a result, plaintiffs have no likelihood of success on the merits of this claim

and will therefore not prevail on their application for a preliminary injunction on this basis.

**Irreparable harm**

Plaintiffs also bear the burden to show that they will suffer irreparable harm if the

preliminary injunction is not issued.  <u>Acierno</u>, 40 F.3d at 653.  However, "[e]conomic loss does

not constitute irreparable harm."  <u>Id.</u>  Here, plaintiffs seek to protect their financial investment,

which is inarguably harm that is solely economic in nature.  Further, the harm associated with a

financial loss is not of such a peculiar or unique nature that would render it uncompensable by

money alone.  <u>See id.</u>  ("[T]he injury created by a failure to issue the requested injunction must

'be of a peculiar nature, so that compensation in money cannot atone for it.'" (citations

omitted)).  Finally, the harm plaintiffs allege is rather speculative since "EquiFin is current in its

interest payment obligations on the EquiFin notes held by Winfield and InterGroup."  (Craig

Aff. ¶ 60.)  Plaintiffs have failed to demonstrate any present, tangible harm that the preliminary

injunction would address.  As a result, plaintiffs fail to satisfy the second element of the

preliminary injunction standard.  Since the four elements are conjunctive, and plaintiffs have

failed to satisfy the first two elements – likelihood of success on the merits and irreparable harm

– their application fails.

**Harm to defendants if granted and public interest**

"[W]hile the burden rests upon the moving party to make these two requisite showings

[likelihood of success on the merits and irreparable harm], the district court 'should take into

account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.'" <u>Acierno</u>, 40 F.3d at 653 (quoting <u>Delaware River Port Auth. V. Transamerica Trailer Transp., Inc.</u>, 501 F.2d 917, 920 (3d Cir. 1974)).  Here, plaintiffs' failure to prevail on the first two requirements is fatal to their application.  "'[A] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction.'" <u>South Camden Citizens in Action v. New Jersey Dept. of Envtl. Prot.</u>, 274 F3d 771, 777 (3d Cir. 2001) (quoting <u>In re Arthur Treacher's Franchise Litig.</u>, 689 F.2d 1137, 1143 (3d Cir. 1982).  Once a court determines that a case is legally insufficient, further analysis is unnecessary.  <u>Id.</u>

Since this Court finds that plaintiffs are unlikely to succeed on the merits of the case, and that plaintiffs have failed to demonstrate irreparable harm if the preliminary injunction is not issued, further analysis is unnecessary.[12]

<u>**Conclusion**</u>

As set forth above, the Court will deny plaintiffs' request for appointment of a receiver. Additionally, as to the request for a preliminary injunction, plaintiffs have failed to show a likelihood of success on the merits or any irreparable harm.  Therefore, plaintiffs' application for a preliminary injunction will be denied.

---

[12]  If this Court were to consider the final two factors, neither one would support plaintiffs' request for a preliminary injunction.  As discussed in conjunction with the request for a receiver, interference with defendants' ability to manage their company could potentially harm the company.  Similarly, since EquiFin is a publicly traded company, the public interest could be adversely impacted if the company's management is mishandled by outsiders in the form of either a receiver or this Court, thus impacting the value of the public's investment in the company.  Therefore, neither of these factors support plaintiffs' request for a preliminary injunction.

27

Dated:   July 14, 2005   

> S/Joseph A. Greenaway, Jr.
> JOSEPH A. GREENAWAY, JR., U.S.D.J.